**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **JIMMY HALL, *et al*.,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 8:26-cv-00142** |
| **WEACHIEVE, INC., *et al*.,** | |
| **Defendants.** | |

**DEFENDANT WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

**COMES NOW**, Defendant Washington Metropolitan Area Transit Authority (hereafter "WMATA"), by and through undersigned counsel, and submits this memorandum of points and authorities in support of its Motion to Dismiss Plaintiffs' Amended Complaint.

## I. INTRODUCTION

Plaintiffs allege that after surreptitiously leaving a privately-operated group home unrelated to WMATA, Rashawn Williams ("Mr. Williams"), an adult with a mental disability, entered WMATA's transit system on the evening of October 20, 2023, first boarding a Metrobus on the R2 route and later a Metrorail train that ultimately stopped at the Glenmont Station after service ended. (*See* Ex. 1 (Am. Compl.) at ¶¶ 6, 28–29, 38.)

According to Plaintiffs, after alighting from the Metrorail train, Mr. Williams exited the Glenmont station, then later returned to the station, entered a locked room within the Glenmont Station identified as an "area of refuge" ("AOR"), and then entered a "second doorway that leads to *another stairway and emergency exit ladder with access to the street*[,]", which is where Mr. Williams was later found. (*Id*. at ¶¶ 52-55.) (emphasis added.) Despite Plaintiffs' statement as to

the existence of an exit and access to the street—Plaintiffs allege that Mr. Williams was "entrapped in a locked room" and in a condition "that amounted to solitary confinement." (*Id.* at 59 and 67.) Notably, the Complaint is silent as to why Mr. Williams did not exit to street level.

Plaintiffs allege that WMATA employees failed to search the AOR during routine station inspections and failed to comply with internal WMATA standard operating procedures requiring station managers to inspect platforms, mezzanines, and areas of refuge to ensure that no customers remained in the station after service hours. (*Id.* at ¶¶ 55–56.) The Amended Complaint also alleges that WMATA personnel failed to adequately monitor station surveillance footage and failed to respond appropriately after Mr. Williams was reported missing. (*Id.* at ¶¶ 57, 59–61.) As a result of these alleged omissions, Plaintiffs contend that Mr. Williams remained "trapped" in the locked room for approximately six days, suffering physical and emotional harm. (*Id.* at ¶¶ 53, 59–67.)

Plaintiffs' Amended Complaint asserts three causes of action against WMATA: negligence (Count II), violation of Title II of the Americans with Disabilities Act of 1990 ("ADA") (Count III), and violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") (Count IV).

In Count II, Plaintiffs allege that WMATA was negligent based on alleged violations of WMATA's own internal rules and policies, including purported failures to provide attention or assistance to Mr. Williams, to exercise sufficient care, and to conduct inspections of certain station areas, including an area of refuge. Plaintiffs further allege that these asserted failures contributed to Mr. Williams's injuries. (Am. Compl.) at ¶¶ 91-98.)

In Count III, Plaintiffs allege that WMATA violated Title II of the ADA by failing to communicate effectively with Mr. Williams, failing to provide him with adequate information concerning WMATA's transportation services, failing to ensure that he had the means or

information necessary to exit the station, failing to provide appropriate assistance in light of his disability, and failing to comply with WMATA's internal rules and procedures, thereby allegedly denying him an equal opportunity to participate in or benefit from WMATA's services. (Am. Compl.) at ¶¶ 99-111.)

In Count IV, Plaintiffs allege that WMATA violated Section 504 of the Rehabilitation Act by excluding Mr. Williams from participation in, or denying him the benefits of, WMATA's services, programs, or activities, and by allegedly discriminating against him on the basis of his disability. (Am. Compl.) at ¶¶ 112-124.)

For each of these counts, Plaintiffs seek an award of monetary damages and request a jury trial.

## II. <u>STANDARD OF REVIEW</u>

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the Court's subject-matter jurisdiction. The plaintiff bears the burden of establishing that jurisdiction exists. *Evans v. B.F. Perkins Co*., 166 F.3d 642, 647 (4th Cir. 1999); *Demetres v. E.W. Constr., Inc.*, 776 F.3d 271, 272 (4th Cir. 2015). Because federal courts are courts of limited jurisdiction, they have an independent obligation to determine whether subject-matter jurisdiction exists before addressing the merits of any claim. *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc*., 369 F.3d 385, 390 (4th Cir. 2004).

Where, as here, a defendant asserts sovereign immunity, dismissal under Rule 12(b)(1) is appropriate because sovereign immunity deprives the Court of subject-matter jurisdiction. *Cunningham v. Gen. Dynamics Info. Tech., Inc*., 888 F.3d 640, 649 (4th Cir. 2018); *Proctor v. Wash. Metro. Area Transit Auth*., 412 Md. 691, 706-712, 990 A.2d 1048, 1056–59 (2010). In resolving a Rule 12(b)(1) motion, the Court may consider evidence outside the pleadings and is

not limited to the allegations of the complaint. *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004). Unlike a motion under Rule 12(b)(6), a Rule 12(b)(1) motion permits the Court to weigh the evidence to determine whether jurisdiction exists. *Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995).

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-244 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court need not accept legal conclusions or conclusory allegations unsupported by factual content. *Iqbal*, 556 U.S. at 678-679. A complaint that fails to allege facts sufficient to establish each essential element of a claim is subject to dismissal. *Goss v. Bank of Am., N.A.*, 917 F. Supp. 2d 445, 449 (D. Md. 2013).

## III. ARGUMENT

### A. COUNT II SHOULD BE DISMISSED AS IT IS BARRED BY SOVEREIGN IMMUNITY

WMATA is an interstate compact agency and instrumentality of Maryland, Virginia, and the District of Columbia. *See, e.g., Lizzi v. Alexander*, 255 F.3d 128, 131 (4th Cir. 2001). The WMATA compact ("Compact") was approved by Congress in 1966. *See* Washington Metropolitan Area Transit Authority Compact, Pub.L. No. 89–774, 80 Stat. 1324 (1966).

It should be "note[d] at the outset that WMATA possesses Eleventh Amendment immunity." *Lizzi*, 255 F.3d at 132. The signatories of the Compact intended to confer Eleventh Amendment immunity on WMATA. *Id.*, citing *Delon Hampton & Assoc. v. WMATA*, 943 F.2d 355, 359 (4th Cir. 1991). Further, both the Fourth Circuit and the D.C. Circuit have held that Eleventh Amendment immunity may attach to WMATA's actions. *See id*. at 359; *Morris v.*

*WMATA*, 781 F.2d 218, 219-220 (D.C. Cir. 1986). WMATA is a state agency, subject to all the benefits and liabilities of a state itself, including sovereign immunity. *Lizzi*, 255 F.3d at 132, citing *Morris*. It does not matter that WMATA was created by interstate compact, as opposed to being an agency of one state alone. *Id*., citing *Delon Hampton*, 943 F.2d at 359; *Jones v. WMATA*, 205 F.3d 428, 432 (D.C. Cir. 2000).

Although WMATA has partially waived its sovereign immunity for torts committed in the course of proprietary activities, it has expressly retained immunity for torts arising from governmental functions. Section 80 of the Compact declares that WMATA:

> shall be liable for its contracts and for its torts and those of its Directors, officers, employees and agent [sic] committed in the conduct of any proprietary function, in accordance with the law of the applicable signatory (including rules on conflict of laws), *but shall not be liable for any torts occurring in the performance of a governmental function*. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this title shall be construed as a waiver by the District of Columbia, Maryland, Virginia, and the counties and cities within the zone of any immunity from suit.

Compact, 80 Stat. at 1350 (emphasis added.)

Protection of customers' security is within the purview of law enforcement, and the WMATA Compact specifically authorizes the establishment of a police force to provide such services. *Burns v. Washington Metro. Area Transit Auth*., 488 F. Supp. 3d 210, 216 (D. Md. 2020), citing Md. Code Ann., Transp. 10-204 (76(a)) ("[WMATA] is authorized to establish and maintain a regular police force, to be known as the Metro Transit Police, to provide protection for its patrons, personnel, and transit facilities."). Law enforcement, generally, is viewed as a quintessential government function. *Id*., citing *Beebe v. WMATA*, 129 F.3d 1283, 1287 (D.C. Cir. 1997), quoting *Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) ("To distinguish governmental from proprietary functions, [courts] ask whether the activity amounts to a quintessential governmental

function, like law enforcement."). Courts have deemed WMATA's police activities to be an exercise of a governmental function. *Id.*, citing *Davis v. TSA*, 264 F. Supp. 3d 6, 11 (D.D.C. 2017), quoting *Dant v. District of Columbia*, 829 F.2d 69, 74 (D.C. Cir. 1987); *Morris*, 781 F.2d at 218 ("If the operation of a police force is not a governmental function, then a governmental function may not exist."), quoting *Martin v. WMATA*, 667 F.2d 435, 436 (4th Cir. 1981).

In *Burns*, this Court found that a plaintiff's claim that WMATA provided insufficient security was barred "by sovereign immunity, then, because they implicate the quintessential governmental function of law enforcement." *See* 488 F. Supp. 3d at 213, 217. *Burns* noted how the United States District Court for the District of Columbia, in *Doe v. WMATA*, concluded that WMATA was entitled to sovereign immunity in a case involving customer safety. *See id*. at 216. A female passenger on a WMATA train suffered a horrific rape, committed by a perpetrator who had previously been identified by WMATA as having publicly masturbated on its trains. *Doe v. WMATA*, 453 F. Supp. 3d 354, 359-360 (D.D.C. 2020). WMATA had not identified the perpetrator to its other passengers, or tried to prevent him from riding its trains. *Id.* In ruling that the woman's tort claims were barred by sovereign immunity because they focused on WMATA's failure to take certain actions in response to a prior notice of criminal activity, the court reasoned:

> [I]t is clear beyond cavil that, after a crime has been committed and "the WMATA transit police are involved, WMATA's function is governmental in nature." *Davis v. Sarles*, 134 F. Supp. 3d 223, 227 (D.D.C. 2015); *see also Burkhart v. WMATA*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) (explaining that "police activity" is a quintessential government function); *Martin v. WMATA*, 667 F.2d 435, 436 (4th Cir. 1981) ("The operation of a police force is a quintessential government function"). Thus, the bulk of the claims that Doe brings in this lawsuit fail to clear the sovereign-immunity bar at the outset, because any alleged negligent failure of the agency to respond to potentially criminal behavior by one of its customers in a certain manner – even one that, according to Doe, the general duty of reasonable care requires – involves the exercise of a quintessential governmental function of the agency.

*Id*. at 364-365.

Similarly, in *Williams v. Washington Metro. Area Transit Auth.*, this Court held that a claim that WMATA's "alleged failure to protect one of its customers, which involves law enforcement activity, [is] a quintessential governmental function" and is barred by sovereign immunity. CV GLS-21-2373, 2023 WL 4421573, at *7 (D. Md. July 10, 2023). There, the plaintiff alleged that the WMATA bus driver failed to protect her from an attack from another passenger. *See id*. at *6 (D. Md. July 10, 2023). The Court determined such a claim was barred by sovereign immunity as "[i]n essence, then, Plaintiff's Complaint alleges that Defendant had a duty to protect its customers from being physically assaulted, and that the Bus Driver's failure to secure the Passenger breached that duty as it allowed the Passenger to assault Plaintiff." *Id*. The Court concluded "this case involves a claim that WMATA failed to adequately protect one of its customers from a threat to her security" and it "implicates a quintessential governmental function because 'protection of customers' security is within the purview of law enforcement." *Id*., quoting *Burns*, 488 F. Supp. 3d at 216-217. The Court found that any course of action that the plaintiff claimed that the bus driver negligently failed to take—including relocating, removing, or re-securing the passenger—likewise falls under the spectrum of law enforcement activity, *i.e.*, the exercise of a quintessential governmental function. *Id*., citing *Doe*, 453 F. Supp. 3d at 365.

Here, Plaintiffs' negligence claim likewise rests upon WMATA's alleged "failures…to properly respond to the [police] report of Rashawn's disappearance…" (Amend. Compl. at ¶ 59.) This clearly attacks WMATA's police functions, since Plaintiffs state that after Mr. Williams was noted to be lost, Defendant WeAchieve "called the police" and Montgomery County Police Officers ("MCPD") arrived at the Residence Inn shortly thereafter in response to WeAchieve's "call for missing person Rashawn Williams." (*Id*. at ¶¶ 31 and 35.) "The officers began to search

for Rashawn and to notify other agencies for assistance via BOLO (Be On the Lookout) only." (*Id*. at ¶ 36.) Plaintiffs then allege that on October 24, 2023, as Mr. Williams was still missing, "the case was transferred to Montgomery County Police Department Major Crimes Unit/Missing Person/Cold Case Section." (*Id*. at ¶ 48.) Mr. Williams was ultimately found when "MCPD officer Joe Green was conducting a search for Rashawn at the Glenmont Metro Station." (*Id*. at ¶ 51.)

Here, the essence of Count II is that WMATA should have done a better, non-negligent job in searching for a missing person, a task which is clearly a core governmental police function, as the Montgomery County Police Department was in fact doing the same thing. WMATA's Compact grants it authority to police its system, promulgate safety rules, and secure stations, all of which reflect a delegation of sovereign power that remains immune from tort liability. *See* Md. Code Ann., Transp. § 10-204(76)(a), (80); *Burns*, 488 F. Supp. 3d at 216-217; *Doe*, 453 F. Supp. 3d at 364-365; *Burkhart*, 112 F.3d at 1216; *Martin*, 667 F.2d at 435. Other courts, notably the District of Columbia, analyzing the WMATA Compact, have repeatedly held that claims challenging these types of functions are barred by sovereign immunity. *See Beebe v. Wash. Metro. Area Transit Auth.*, 129 F.3d 1283, 1287-1288 (D.C. Cir. 1997) (holding that decisions concerning the provision and adequacy of transit security, including how WMATA deploys personnel and responds to safety threats, constitute quintessential governmental functions shielded by sovereign immunity under the Compact); *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1216 (D.C. Cir. 1997) (explaining that the WMATA Compact preserves sovereign immunity for governmental functions and identifying police activity and security-related decision-making as paradigmatic examples of such functions); *Afanasieva v. Wash. Metro. Area Transit Auth.*, 588 F. Supp. 3d 99, 110-112 (D.D.C. 2022) (dismissing negligence claims alleging failure to ensure passenger safety and to respond appropriately to dangerous conditions on the ground that such claims impermissibly

challenge WMATA's discretionary law-enforcement and public-safety functions, which remain immune under the Compact).

In *Simpson v. WMATA*, the plaintiff argued WMATA failed "in operating and maintaining the subway system allegedly causing plaintiff's injuries…WMATA failed to maintain and operate the system by permitting the subway car to become overcrowded…allegedly resulted in plaintiff's inability to discern the gap." 688 F. Supp 765, 766 (D.D.C. 1988), *aff'd*, Case No. 88-7190, 1990 WL 104842 (D.C. Cir. June 5, 1990). Notably, the plaintiff argued that the station manager was responsible for controlling the station's crowds. *See id*. at 768 ("…WMATA maintains kiosk attendants at each of its stations who are authorized to close the station in the event of an unusual occurrence or overcrowding."). In ruling that WMATA had sovereign immunity from such a claim, the Court stated:

> Section 76 of the Compact enables and authorizes WMATA to maintain a police force with significant police power *to protect passengers and property*. Furthermore, the Compact grants WMATA the power to promulgate rules and regulations *to assure the safety and protection of the riding public* which are enforceable by the WMATA police force. WMATA's operation of its police force and those police activities are governmental functions and, as such, are immune from suit.

*Id*. at 767. (emphasis added.)

*Simpson* relied heavily on that Court's prior ruling in *Gillot v. WMATA*, 507 F. Supp. 454 (D.D.C. 1981). *See id*. at 767. There, the plaintiff sued WMATA and claimed that it was negligent in monitoring a WMATA parking lot for her own safety from an assault. *Id*. WMATA argued that the monitoring of the parking lot was a challenge to the adequacy of WMATA's police protection. *Id*. In deciding the issue, the Court first found that "[p]roviding police protection is a governmental function for purposes of sovereign immunity." *Id*.

As to the claim of inadequate monitoring of the parking lot, the Court held:

> This aspect of Plaintiff's claim goes to WMATA's governmental function of providing police protection throughout the METRO system. Since police protection is a governmental function, Plaintiff may not challenge inadequate police protection under the concept of sovereign immunity embodied in Section 80 of the WMATA Compact.

507 F. Supp. at 456.

Similarly in *Whitaker v. WMATA*, an intoxicated plaintiff, who walked off of the station platform and into the train tunnel, argued that the "[WMATA] employees had an obligation, 'from the moment plaintiff appeared totally intoxicated *presenting a danger to himself* and incapable of controlling his mental and physical functions . . . *to ensure plaintiff's safety*…'" Case No. 82-2771, 1984 U.S. Dist. LEXIS 16712 at *3-4, 21 (D.D.C. May 14, 1984), *aff'd*, 804 F.2d 153 (D.C. Cir. 1986) (emphasis added). Plaintiff also argued that WMATA "failed to take any action and *permitted plaintiff, in his incompetent state, to remain in the subway system*." *Id*. (emphasis added). The Court ruled that WMATA had sovereign immunity from such a claim as "…failure on the part of the Metro police officer *or guard* to act could not be challenged because it constitutes a governmental function." *Id*. at *25 (emphasis added). The duties Plaintiffs invoke—monitoring stations, enforcing safety protocols, responding to reports of missing persons, and securing public facilities—are paradigmatic public duties owed to the general public, not to any particular individual.

Because Plaintiffs' negligence claim arises solely from WMATA's performance of governmental, non-proprietary functions, WMATA retains its sovereign immunity, and Count II should be dismissed with prejudice.

### B. COUNT II SHOULD BE DISMISSED AS IT FAILS TO STATE A CLAIM

Under Maryland law, invitee status exists only when an individual is on the property for a purpose related to the owner's business, and a person who exceeds the scope of that invitation—or returns after it has expired—undergoes a change in legal status and becomes, at most, a bare

licensee or trespasser. *See Lampkin v. Wash. Metro. Area Transit Auth.*, Civil No. TJS-19-2691, 2022 U.S. Dist. LEXIS 66949, *14 (D. Md. Apr. 8, 2022) (applying Maryland law and explaining that an invitee is one who enters property for a purpose related to the owner's business); *Kirby v. Hylton*, 51 Md. App. 365, 370-71 (1982) (recognizing that an entrant may undergo a "geographical or chronological" change of status and become a trespasser when he exceeds the scope of the invitation); *Levine v. Miller*, 218 Md. 74, 79, 145 A.2d 418, 421 (1958) (holding that a landowner's duty does not extend to uses of the premises beyond the scope of the invitation).

A trespasser is "one who intentionally and without consent or privilege enters another's property," while a bare licensee is one who enters with permission but for his own purposes. *Mayor of Balt. v. Wallace*, 492 Md. 349, 358 (2025), *quoting Balt. Gas & Elec. Co. v. Flippo*, 348 Md. 680, 689 (1998). The duty owed by a landowner to a trespasser or bare licensee is exceedingly limited: the landowner owes no duty except to refrain from willful or wanton misconduct or entrapment. *Blackburn Ltd. P'ship v. Paul,* 438 Md. 100, 110–111, 90 A.3d 464, 470–71 (2014); *Bramble v. Thompson*, 264 Md. 518, 522, 287 A.2d 265, 268 (1972) (as to trespassers and bare licensees, a landowner's only duty is to refrain from willful or wanton misconduct or entrapment, and defining entrapment as the creation or maintenance of a concealed dangerous condition or trap).

Moreover, a landowner's duty to maintain a reasonably safe premises is limited to the scope of the invitation extended to the public and "does not extend to the use of such premises for an unintended purpose." *Blackburn*, 438 Md. at 110, *quoting Levine v. Miller*, 218 Md. 74, 79, 145 A.2d 418, 421 (1958). Consistent with this principle, areas of a property that are designated for emergency use only, or otherwise restricted are not areas held open to the public for general use. *See Kirby*, 51 Md. App. at 370–371 (recognizing that an entrant who exceeds the scope of an

invitation or enters areas not intended for public use undergoes a change in status and may become a trespasser); *Bramble*, 264 Md. at 522–23, 287 A.2d at 268 (adopting Restatement principles and explaining that a person who enters land without consent or privilege is a trespasser); *see also* Restatement (Second) of Torts § 329 cmt. B ("Unless a lessee of land other than a tenant at will or at sufferance consents to his lessor's entry upon the particular occasion or by a right of entry reserved in the lease, or unless the lessor enters pursuant to a privilege created otherwise than by the lessee's consent, the lessor or a person entering by his direction or with his consent is a trespasser upon the lessee's possession.").

Courts addressing similar circumstances in the setting of mass transit have likewise held that a passenger who enters a restricted area becomes, at most, a trespasser or bare licensee, thereby ending any passenger-common carrier relationship. *See*, *e.g*., *Whiteru v. Wash. Metro. Area Transit Auth*., 636 F. Supp. 3d 107, 121-122 (D.D.C. 2022) (holding that an intoxicated passenger became a trespasser upon entering a restricted area, even where the entry was accidental, thereby severing the common carrier-passenger relationship); *see also Whiteru v. Wash. Metro. Area Transit Auth.*, 346 A.3d 1188, 1202 (D.C. 2025) (D.C. Court of Appeals responding to a certified question from the U.S. Court of Appeals for the D.C. Circuit, and determining that WMATA only has a duty based upon *actual* knowledge of the trespassers presence.)

Here, Plaintiffs' admit that Mr. Williams exited the Glenmont Station after rail service ended, then re-entered the premises, and entered a non-public and restricted area of the station. (*See* Am. Compl. at ¶¶ 45–46, 53–55.) After Mr. Williams exited the station, there is no allegation that he paid a fare when he later returned to the premises after hours. Therefore, Mr. Williams could not have re-entered the premises for the business purposes of WMATA or the public. By re-entering the station after he had exited, Mr. Williams was at most a bare licensee or a trespasser,

by law. Based on this status, WMATA owed only a duty to refrain from willful or wanton misconduct. Plaintiffs do not allege—nor could they plausibly allege—such misconduct in the Amended Complaint.

Maryland law does not recognize an exception to trespasser status based on the cause of the trespass, whether it be inadvertence, such as in *Bramble*, or mental capacity, as is alleged here. Rather, premises-liability duties turn on the entrant's legal status, which is determined by consent and the scope of any invitation, not the entrant's subjective intent or capacity. *See Bramble v. Thompson*, 264 Md. 518, 522–524, 287 A.2d 265, 268-269 (1972) (use of a boat dock without permission); *Blackburn Ltd. P'ship v. Paul*, 438 Md. 100, 110-112, 90 A.3d 464, 470-471 (2014) (reaffirming Maryland's traditional premises-liability framework under which the duty owed by a landowner depends solely on the entrant's legal status as an invitee, licensee, or trespasser, and declining to expand those duties beyond the established categories absent legislative action); *Baltimore Gas & Elec. Co. v. Flippo*, 348 Md. 680, 689-690, 705 A.2d 1144, 1149-1150 (1998) (defining a trespasser as one who enters property without consent or privilege and explaining that premises-liability status turns on the existence of permission, not the entrant's subjective intent or awareness); *Kirby*, 51 Md. App. at 370–71, 443 A.2d at 643. Labels and conclusory characterizations are not entitled to a presumption of truth where the complaint's own factual allegations fail to support them. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Where a plaintiff's allegations contradict or fail to support the conclusions asserted, dismissal is appropriate. *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

The Amended Complaint states that the room in which Mr. Williams remained contained "an emergency exit leading to the street." (Am. Compl. at ¶ 52.) Yet, Plaintiffs repeatedly

characterize this space as one in which Mr. Williams was "trapped" for several days. (*Id*. at ¶¶ 53–55, 59.) The Amended Complaint offers no factual allegations explaining how a person located in a room with an exit to the street was incapable of leaving or otherwise physically confined. The presence of an exit is fundamentally inconsistent with any theory of reckless disregard for human safety. Plaintiffs' allegations, therefore, undermine the plausibility of their claim that Mr. Williams was "trapped."

Accordingly, even apart from WMATA's sovereign immunity, Count II fails as a matter of Maryland premises-liability law. Because Plaintiffs allege neither a protected status nor willful or wanton conduct, they fail to plead a cause of action. Count II, therefore, should be dismissed with prejudice.

### C. COUNT III SHOULD BE DIMISSED AS PLAINTIFFS FAIL TO STATE A CLAIM UNDER TITLE II OF THE AMERICAN WITH DISABILITIES ACT

Title II of the Americans with Disabilities Act ("ADA") provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Although Plaintiffs allege that WMATA violated Title II of the ADA in a variety of conclusory ways, Count III fails as a matter of law because the Amended Complaint does not plausibly allege that WMATA denied Mr. Williams access to a public service, program, or activity *by reason of his disability.*

To state a claim under Title II of the ADA, a plaintiff must allege facts showing that (1) he is a qualified individual with a disability; (2) he was excluded from participation in, denied the benefits of, or otherwise discriminated against with respect to a public entity's services, programs, or activities; and (3) such exclusion, denial, or discrimination was by reason of his disability. *A*

*Helping Hand, LLC v. Balt. Cnty.*, 515 F.3d 356, 362 (4th Cir. 2008). While the Amended Complaint alleges that Mr. Williams has Down Syndrome, Plaintiffs fail to satisfy the second and third elements of a Title II claim.

The Amended Complaint does not identify any WMATA service, program, or activity from which Mr. Williams was excluded or denied access. To the contrary, Plaintiffs' own allegations establish that Mr. Williams successfully utilized WMATA's public transportation services by boarding a bus, transferring to Metrorail, and riding the system for several hours. (*See* Am. Compl. at ¶¶ 28, 38.) These allegations foreclose any claim that Mr. Williams was denied the benefits of WMATA's core public service—public transit. *See Kornblau v. Dade Cnty.*, 86 F.3d 193, 195 (11th Cir. 1996) (no ADA violation where plaintiff was not denied a public benefit).

A Title II claim should be dismissed where, as here, the complaint fails to identify a specific benefit, service, or program that was withheld. *See, e.g.*, *Smith v. Franklin Cnty.*, 227 F. Supp. 2d 667, 676 (E.D. Ky. 2002) (holding that a Title II claim fails where the complaint does not specify the programs, services, or activities allegedly denied, nor how the denial was caused by the plaintiff's disability). Plaintiffs' generalized allegations that WMATA failed to communicate effectively, failed to provide information, or failed to provide assistance do not substitute for alleging denial of a concrete public benefit protected by the ADA.

Nor does the Amended Complaint plausibly allege discrimination "by reason of" Mr. Williams' disability. The Fourth Circuit recognizes three potential theories of Title II liability: (1) intentional discrimination (disparate treatment), (2) disparate impact, or (3) failure to make reasonable accommodations. *A Helping Hand*, 515 F.3d at 362. Plaintiffs plead none of these potential theories.

There are no allegations of intentional discrimination or disparate treatment. There are likewise no allegations of a facially neutral WMATA policy that disproportionately impacts individuals with disabilities. Plaintiffs also fail to plead a viable failure-to-accommodate claim because the Amended Complaint does not allege that WMATA had notice of a specific need for accommodation, that a reasonable accommodation was requested or required, or that WMATA refused to provide such an accommodation. *See Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 371-372 (D. Md. 2011) (holding that a Title II failure-to-accommodate claim requires allegations that the public entity had notice of the plaintiff's need for accommodation and failed or refused to provide a reasonable accommodation).

Critically, the Amended Complaint does not allege what accommodation Plaintiffs contend should have been provided, when it should have been provided, or how it would have prevented the alleged harm. Indeed, as admitted in the Amended Complaint, Mr. Williams successfully exited the station, only to return after trains were no longer running, and enter a restricted area. (*See* Am. Compl. at ¶ 45-46, 53.) It was this act that resulted in the alleged harm, not a purported violation by WMATA. Plaintiffs fail to allege any causal connection between the purported ADA violations and Mr. Williams' injuries. These allegations undermine any claim that WMATA's reaction to Mr. Williams' disability prevented him from accessing or exiting WMATA's services.

At bottom, Count III attempts to recast allegations of negligence and alleged failures of supervision as disability discrimination. The ADA does not create a remedy for negligence, nor does it impose liability for "thoughtlessness and indifference" unconnected to discriminatory intent. *Proctor*, 32 F. Supp. 2d at 828, 829 n.6 (explaining that "intentional discrimination" under Title II requires deliberate indifference, not mere negligence or thoughtlessness).

To the extent Plaintiffs seek compensatory damages under Title II, their claim fails for the additional reason that such damages are available only upon a showing of intentional discrimination, which requires deliberate indifference to a known or obvious risk of a federal rights violation. *Id*. at 829. Deliberate indifference requires a conscious choice—not negligence, oversight, or bureaucratic inaction. *S.H. v. Lower Merion Sch. Dist*., 729 F.3d 248, 263 (3d Cir. 2013). Plaintiffs' allegations, at most, sound in negligence and fall far short of deliberate indifference.

Because Plaintiffs have failed to allege denial of a public benefit, discrimination by reason of disability, notice of a need for accommodation, or deliberate indifference, Count III fails to state a claim and must be dismissed.

Plaintiffs' reliance on various ADA statutes and implementing regulations does not cure these pleading deficiencies. Allegations that a public entity failed to comply with internal rules, policies, or federal regulations do not, standing alone, establish a violation of Title II creating legal damages. The touchstone of Title II liability is discrimination in access to a public service, program, or activity by reason of disability—not mere noncompliance with regulatory standards or alleged operational shortcomings. *See Alexander v. Choate*, 469 U.S. 287, 304 (1985) (Section 504 and its ADA counterparts do not guarantee equal results or impose general standards of care, but rather prohibit discrimination).

Even assuming *arguendo* that any cited regulation was violated, such a violation would not itself establish that Mr. Williams was excluded from a WMATA service, denied a benefit, or treated differently because of his disability. The ADA is not a vehicle for converting alleged negligence, inattentiveness, or regulatory noncompliance into federal disability-discrimination claims. *See, e.g., Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 371-372 (D. Md. 2011).

Because Plaintiffs fail to plausibly allege discrimination by reason of disability, their citation to regulations is legally immaterial to the Rule 12(b)(6) analysis.

### D. COUNT IV SHOULD BE DISMISSED AS PLAINTIFFS FAIL TO STATE A CLAIM UNDER SECTION 504 OF THE REHABILITATION ACT

Plaintiffs also assert a claim against WMATA under Section 504 of the Rehabilitation Act, which provides that no otherwise qualified individual with a disability shall, solely by reason of his or her disability, be excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal financial assistance. *See* 29 U.S.C. § 794(a). Plaintiffs allege, in conclusory fashion, that WMATA excluded Mr. Williams from participation in, or denied him the benefits of, WMATA's services, or otherwise discriminated against him because of his disability. (*See* Am. Compl. at ¶ 121.)

Section 504 does not guarantee equal outcomes or impose a general duty to protect or rescue individuals with disabilities. Rather, it requires evenhanded treatment and a meaningful opportunity for individuals with disabilities to participate in and benefit from federally funded programs. *Am. Council of the Blind v. Snow*, 311 F. Supp. 2d 86, 95 (D.D.C. 2004). To state a claim under Section 504, a plaintiff must allege that (1) he has a qualifying disability; (2) he was denied the benefits of a program or activity receiving federal financial assistance; and (3) the denial or discrimination occurred solely by reason of his disability. *See, e.g.*, *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 832 (4th Cir. 1994) (explaining the elements of a suit under the Act, and that compensatory damages are not available under the Act absent proof of intentional discrimination).

As with Plaintiffs' Title II claim, the Amended Complaint fails to allege that Mr. Williams was denied any WMATA service, program, or activity. Plaintiffs' own allegations establish that Mr. Williams successfully utilized WMATA's public transportation services by boarding a bus,

transferring to Metrorail, riding the system, and exiting the station without assistance. (*See* Am. Compl. at ¶¶ 28, 38, 45–46.) These allegations defeat any claim that Mr. Williams was excluded from or denied the benefits of WMATA's transit services.

Nor do Plaintiffs plausibly allege discrimination solely by reason of Mr. Williams' disability. The Amended Complaint contains no factual allegations suggesting that WMATA treated Mr. Williams differently than a non-disabled individual under similar circumstances, or that any WMATA action or inaction was motivated by discriminatory animus. Absent such allegations, a Section 504 claim cannot proceed. *See Kornblau v. Dade Cnty.*, 86 F.3d 193, 195 (11th Cir. 1996) (no Rehabilitation Act violation where plaintiff was not denied a public benefit).

To the extent Plaintiffs attempt to ground their Section 504 claim in WMATA's alleged failures to supervise, assist, or protect Mr. Williams, such allegations sound in negligence and are insufficient as a matter of law. Section 504 does not impose a duty to rescue or to ensure personal safety, nor does it convert alleged negligence into disability discrimination. *See Proctor*, 32 F. Supp. 2d at 820, 829 & n.6. As discussed above, Plaintiffs fail to allege deliberate or intentional discrimination, or any causal connection between Mr. Williams's disability and the injuries alleged.

Because the standards governing Section 504 claims are "substantially similar" to those applicable under Title II of the ADA, Plaintiffs' failure to state a Title II claim likewise compels dismissal of Count IV. *See Pandazides*, 13 F.3d at 832; *Paulone v. City of Frederick,* 787 F. Supp. 2d 360, 371-372 (D. Md. 2011). Count IV therefore fails as a matter of law and must be dismissed.

Plaintiffs likewise cite various statutes and regulations in support of their Section 504 claim, but regulatory citation cannot substitute for pleading the required elements of discrimination. Section 504 prohibits exclusion from or denial of federally funded benefits solely

by reason of disability; it does not federalize standards of customer service, internal procedures, or general safety practices. *See Alexander v. Choate*, 469 U.S. 287, 301-305 (1985). Thus, even if Plaintiffs could show technical noncompliance with a regulation, that would not establish discrimination absent facts showing that the alleged conduct occurred solely because of disability.

Plaintiffs premise Section 504 liability on alleged regulatory violations untethered to discriminatory exclusion or disparate treatment. At most, Plaintiffs' allegations sound in negligence or operational oversight, which are not actionable under § 504. *See Proctor*, 32 F. Supp. 2d at 829. Because the Amended Complaint does not plausibly allege denial of a benefit or discrimination solely by reason of disability, Plaintiffs' regulatory citations are irrelevant to the dispositive legal inquiry.

Finally, even if Plaintiffs had alleged an intentional act of denial of services due to discrimination, Plaintiffs' claimed damages only describe emotional impact, which is not compensable under Section 504. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022) (emotional-distress damages are not recoverable under § 504 because such damages are not traditionally available in contract).

### E. PLAINTIFFS REQUEST FOR A JURY TRIAL AS TO COUNTS III AND IV SHOULD BE DISMISSED

Assuming *arguendo*, that Plaintiffs are permitted to proceed on Counts III and IV, the prayer for a jury trial as to these counts is invalid.

Neither Title II nor § 504 contains an express statutory right to a jury trial. Any jury entitlement must therefore arise, if at all, under the Seventh Amendment. The Seventh Amendment preserves the right to a jury trial in suits at common law where legal rights and remedies are at issue, but it does not apply to claims seeking purely equitable relief. *See Tull v. United States*, 481 U.S. 412, 417-418 (1987); *Curtis v. Loether*, 415 U.S. 189, 194–195 (1974). Injunctive and

declaratory relief are equitable in nature and do not trigger a jury-trial right. *Tull*, 481 U.S. at 417-418. Because the Amended Complaint does not plausibly allege intentional discrimination, Plaintiffs cannot recover compensatory damages and no jury right attaches.

Title II and § 504 share the same remedial framework and are generally construed *in pari materia*. The Fourth Circuit expressly recognized that the two statutes impose largely identical substantive requirements and are interpreted consistently. *See Pandazides*, 13 F.3d at 829 n.9. As a result, the analysis of available remedies—and jury rights—is the same under both statutes.

The Supreme Court has held that the remedies available under Spending Clause statutes such as § 504—and by extension Title II—are limited to those traditionally available for intentional violations. *See Barnes v. Gorman*, 536 U.S. 181, 187-189 (2002). Consistent with *Barnes*, the Fourth Circuit has made clear that compensatory damages are not available for mere negligence or bureaucratic failure but require proof of intentional discrimination. *See Sellers v. Sch. Bd. of City of Manassas*, 141 F.3d 524, 528-529 (4th Cir. 1998). In this context, intentional discrimination is established through a showing of deliberate indifference, which requires actual knowledge of a substantial likelihood of a statutory violation and a failure to act despite that knowledge. *Id*. at 529. Nothing resembling that high bar is alleged by Plaintiffs.

Accordingly, where a plaintiff fails to plausibly allege deliberate indifference or other intentional discrimination, compensatory damages are unavailable as a matter of law. In such circumstances, the plaintiff is limited to equitable remedies, and no Seventh Amendment jury right exists. *Tull*, 481 U.S. at 417–18.

The allegations in the Amended Complaint sound in negligence and failures to follow internal procedures, not intentional discrimination. Plaintiffs allege that WMATA personnel failed to follow protocols, failed to inspect certain areas, failed to monitor cameras consistently, and

failed to respond adequately to Mr. Williams's presence in the station. They further allege that an employee did not provide assistance and was inattentive while on a personal call. These allegations, even if accepted as true, do not plausibly allege that WMATA acted *because of* Mr. Williams's disability or that WMATA personnel had actual knowledge that their conduct likely violated federal disability law and consciously disregarded that risk.

Indeed, the Amended Complaint repeatedly characterizes WMATA's conduct as negligent and as violations of internal rules and protocols. Allegations of negligence are legally insufficient to establish deliberate indifference under controlling Fourth Circuit precedent. *Sellers*, 141 F.3d at 529–530. Absent factual allegations supporting a plausible inference of intentional discrimination, Plaintiffs cannot recover compensatory damages under either Title II or § 504. Because Plaintiffs have not plausibly alleged intentional discrimination, their potential remedies under Title II and § 504 are limited to equitable relief. Where only equitable relief is available, the Seventh Amendment provides no right to a jury trial. *Tull*, 481 U.S. at 417-418. Plaintiffs' jury demand on their ADA and Rehabilitation Act claims should therefore be stricken.

## IV. CONCLUSION

For the foregoing reasons, WMATA respectfully requests that the Court grant its motion to dismiss the Complaint. Plaintiffs' tort claim is barred (1) by WMATA's sovereign immunity because it arises from governmental functions, and (2) because Mr. Williams was, at most, a bare licensee or trespasser to whom WMATA owed no actionable duty absent willful or wanton conduct, which is not alleged in the Amended Complaint.

Plaintiffs further fail to state a claim under Title II of the ADA or Section 504 of the Rehabilitation Act, as the Amended Complaint does not plausibly allege denial of a public benefit,

discrimination by reason of disability, deliberate indifference, or any other basis for relief. Plaintiffs jury demand under these sections likewise are not permissible.

Accordingly, all claims against WMATA should be dismissed with prejudice.

Respectfully submitted,

*/s/ James T. Hittinger*
James T. Hittinger, Esq. (#19136)
KIERNAN TREBACH LLP
1776 Eye Street, NW, 6th Floor
Washington, DC 20006
Tel: (202) 712-7000 | Fax: (202) 712-7100
jhittinger@kiernantrebach.com
*Counsel for Washington Metropolitan Area Transit Authority*