**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JIMMY HALL, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>WEACHIEVE, INC, *et al*.,<br><br>Defendants. | Case No. 8:26-cv-00142-PX |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. STANDARD OF REVIEW .......... 2

III. ARGUMENT .......... 3

A. Sovereign immunity does not bar Plaintiffs' negligence claim. .......... 5

1. The alleged conduct is not quintessentially governmental. .......... 6

2. WMATA's conduct was proprietary, not discretionary. .......... 8

B. Plaintiffs adequately allege a claim for negligence. .......... 10

1. Rashawn Williams was not a trespasser, and at minimum, entrant status is a question of fact not properly resolved at the pleading stage. .......... 11

2. WMATA owed a heightened duty of care to Rashawn Williams because it is a common carrier. .......... 13

3. WMATA assumed a duty to Rashawn Williams through its acts and omissions. .......... 14

C. Plaintiffs adequately allege a claim for violation of Title II of the ADA and for violation of the Rehabilitation Act. .......... 17

1. Plaintiff Rashawn Williams was denied meaningful access to WMATA's transit services. .......... 18

2. The Amended Complaint plausibly alleges discrimination "by reason of" disability. .......... 20

a. The Amended Complaint plausibly alleges intentional discrimination under Title II and Section 504. .......... 20

b. The Amended Complaints also plausibly alleges discrimination based on WMATA's failure to make reasonable accommodations. .......... 22

D. Plaintiffs are entitled to a trial by jury. .......... 23

IV. CONCLUSION .......... 24

## TABLE OF AUTHORITIES

**Cases**

*A Helping Hand, LLC v. Balt. Cnty.,* 515 F.3d 356 (4th Cir. 2008) ............................................ 20
*Adams v. Montgomery College (Rockville)*, 834 F. Supp. 2d 386 (D. Md. 2011)........................ 21
*Alexander v. Choate*, 469 U.S. 287 (1985) ..................................................................................... 22
*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ............................................................................................ 3
*Banneker Ventures, LLC v. Graham,* 798 F.3d 1119 (D.C. Cir. 2015) .......................................... 8
*Bell A. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................................. 3
*Ben-Joseph v. Mt. Airy Auto Transporters, LLC,* 529 F. Supp. 2d 604 (D. Md. 2008)................. 3
*Boyrie v. E & G Prop. Servs.*, 58 A.3d 475 (D.C. 2013) .............................................................. 12
*Burns v. Wash. Metro. Area Transit Auth.*, 488 F. Supp. 3d 210 (D. Md. 2020) ........................... 7
*Doe v. Wash. Metro. Area Transit Auth.*, 453 F. Supp. 3d 354 (D.D.C. 2020) .............................. 8
*Edwards v. Gramling Eng'g Corp.*, 322 Md. 535 (1991)............................................................... 24
*Feakes v. Wash. Metro. Area Transit Auth.*, No. 8:23-2145-AAQ, 2025 U.S. Dist. LEXIS 180794 (D. Md. Sept. 16, 2025) ........................................................................................... 6, 13
*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002) ................................. 17
*Gable v. Gable*, 245 W. Va. 213 (2021) ......................................................................................... 11
*Garnitschnig v. Horovitz*, 48 F. Supp. 3d 820, 828 (D. Md. 2014) ................................................ 3
*GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543 (4th Cir. 2001)........................... 3
*Glaze v. Benson*, 205 Md. 26 (1954) .............................................................................................. 12
*Harris v. Wash. Metro. Area Transit Auth.*, 490 F. Supp 3d 295 (D.D.C. 2020)........................... 6
*Hendricks v. Wash. Metro. Area Transit Auth.*, No. 8:18-cv-02397, 2024 U.S. Dist. LEXIS 14864 (D. Md. Jan. 29, 2024) ............................................................................................. 6, 8
*Henley v. Prince George's County*, 305 Md. 320 (1986) ............................................................ 16
*Howard County Bd. of Educ. v. Cheyne*, 99 Md. App. 150 (1994) ............................................. 11
*Kaplan v. Baltimore & O.R. Co.*, 207 Md. 56 (Md. 1955) ........................................................... 13
*Martin v. Howard County*, 349 Md. 469 (1998).............................................................................. 24
*Mech v. Hearst Corp.,* 64 Md. 422 (1985)......................................................................................... 11
*Miller & Long Co. v. Shaw*, 204 A.2d 697 (D.C. 1964) ................................................................ 12
*Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) ......................................... 18, 22
*Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823 (4th Cir. 1994) .................................... 18, 20, 21, 24
*Paulone v. City of Frederick*, 787 F. Supp. 2d 360 (D. Md. 2011) ................................ 20, 21, 24
*Proctor v. Prince George's Hosp. Ctr.,* 32 F. Supp. 2d 820 (D. Md. 1998) .......................... 20, 21
*Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691 (2010)................................................. 6
*Roberson v. Ginnie Mae REMIC Trust 2010 H01*, 973 F. Supp. 2d 585 (D. Md. 2013) ............... 3
*Seremeth v. Bd. of Cty. Comm'rs of Frederick*, 673 F.3d 333 (4th Cir. 2012) ........... 17, 19, 22, 23
*Simpson v. Wash. Metro. Area Transit Auth.*, 688 F. Supp. 765 (D.D.C. 1988) ........................... 7
*Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201 (4th Cir. 2002 ....................................... 8

*Sullivan v. Wash. Metro. Area Transit Auth.*, No. GLS-19-300, 2020 U.S. Dist. LEXIS 32859 (D. Md. Feb. 26, 2020) ..... 17
*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) ..... 3
*Tinsley v. Wash. Metro. Area Transit Auth.*, 429 Md. 217 (2012) ..... 5, 6
*Tull v. United States*, 481 U.S. 412 (1987) ..... 23
*United States v. Gaubert*, 499 U.S. 315 (1991) ..... 8
*Valentine v. On Target, Inc.*, 353 Md. 544 (1999) ..... 16
*Wash. Metro. Area Transit Auth. v. O'Neil*l, 633 A.2d 834 (D.C. 1993) ..... 6
*Wash. Metro. Area Transit Auth. v. Ward*, 433 A.2d 1072 (D.C. 1981) ..... 11
*Whiteru v. Wash. Metro. Area Transit Auth.*, 258 F. Supp. 3d 175 (D.D.C. 2017) ..... 7, 9
*Whiteru v. Wash. Metro. Area Transit Auth.,* 346 A.3d 1188 (D.C. 2025) ..... 14
*Williams v. Big Picture Loans, LLC*, 929 F.3d 170 (4th Cir. 2019) ..... 5, 10
*Williams v. Wash. Metro. Area Transit Auth.*, No. GLS-21-2373, 2023 WL 4421573 (D. Md. July 10, 2023) ..... 7
*Workagegnehu v. Wash. Metro Area Transit Auth.*, 373 F. Supp. 3d 110 (D.D.C. 2019) ..... 8

**<u>Statutes</u>**

28 C.F.R. § 35.130(b)(7) ..... 18, 22
28 C.F.R. § 35.160 ..... 18, 23
29 U.S.C. § 194(b)(1) ..... 18
29 U.S.C. § 794(a) ..... 17, 18
42 U.S.C. § 12102(1) ..... 18
42 U.S.C. § 12131(1) ..... 18
42 U.S.C. § 12132 ..... 17, 18
42 U.S.C. § 12161 ..... 18
49 C.F.R. § 37.161(a) ..... 19
49 C.F.R. § 37.167(f) ..... 19, 23
49 C.F.R. § 37.173 ..... 19
Md. Code Ann., Transp. § 10-204(80) ..... 6

**<u>Other Authorities</u>**

RESTATEMENT (SECOND) OF TORTS § 314 ..... 13
RESTATEMENT (SECOND) OF TORTS § 323 ..... 15, 16
RESTATEMENT (SECOND) OF TORTS § 336 ..... 14

COMES NOW, Plaintiffs, by and through undersigned counsel, and submit this Memorandum in Opposition to Defendant Washington Metropolitan Area Transit Authority's Motion to Dismiss Plaintiffs' Amended Complaint. Plaintiffs state the following:

## I. INTRODUCTION

This case arises from the six-day disappearance of Plaintiff, Rashawn Williams, a disabled adult. On October 20, 2023, Rashawn, who requires 24-hour supervision, left his temporary residence provided by his group home and boarded a Metrobus on the R2 route. Am. Compl. ¶¶ 18, 28, ECF No. 9-1. The Montgomery County Police Department ("MCPD") and his parents, Plaintiffs Jimmy and Christina Hall, were notified that evening that Rashawn was missing from his residence. *Id*. at ¶¶ 32, 35. The MCPD began to search for Rashawn and notify other agencies for assistance. *Id*. at ¶¶ 36- 37.

As his parents would later learn, Rashawn had taken the bus to a Washington Metropolitan Area Transit Authority ("WMATA") station and took a WMATA train until approximately 12:37 a.m. on October 21, 2023, when the train arrived at Glenmont Metro Station and stopped running. *Id*. at ¶ 38. A WMATA employee found Rashawn on the train because he did not understand that it was no longer in service. *Id*. at ¶ 39. The employee instructed Rashawn to get off the train, without providing further assistance, despite Rashawn's visible disability and obvious confusion. *Id*. Upon leaving the train, Rashawn remained standing at the platform as if he were waiting for another train. *Id*. at ¶ 39. The WMATA employee told Rashawn that no other trains were in service and observed him heading towards the escalators. *Id*. at ¶ 40.

Rashawn then attempted to leave at the Glenmont Metro Station fare gate but was unable to exit and stood by the closest kiosk awaiting assistance. *Id*. at ¶ 44. WMATA employee and Station Manager, Devin Yelverton, was in the kiosk using the landline phone for a personal call

at that time. *Id*. at ¶ 43. Despite seeing Rashawn, Mr. Yelverton did not address him and instead continued his personal call. *Id*. at ¶¶ 44- 46. In frustration, Rashawn threw up his hands and walked back further into the metro station. *Id*. at ¶ 46. Mr. Yelverton did not stop Rashawn, assist him, or engage him in any way.

Six days later, on October 26, 2023, around 9:47 p.m., an MCPD officer found Rashawn during his search for him at the Glenmont Metro train station. *Id*. at ¶ 51. He was found inside an area referred to as an "area of refuge" or "AOR," a storage room that one could enter through an emergency exit door. *Id*. at ¶¶ 52, 54. For almost a week, Rashawn had been trapped in horrific conditions without access to food, water, or sanitation. *Id* at. ¶ 62. His harrowing ordeal left him severely dehydrated and physically depleted and caused profound psychological harm that has impacted Rashawn's daily behavior, including his sleep, eating, attention span, and emotions. *Id*. at ¶¶ 63-81.

In their Amended Complaint, Plaintiffs assert three causes of action against Defendant WMATA in relation to the disappearance of Plaintiff Rashawn Williams: negligence (Count II), violation of Title II of the Americans with Disabilities Act of 1990 ("ADA") (Count III), and violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act") (Count IV). Each cause of action is rooted in WMATA's failure to abide by its own internal rules and policies such that they failed to assist Rashawn and provide him services. As a result, WMATA facilitated Rashawn's entry into the AOR, allowed Rashawn to become trapped there, failed to locate him in a timely manner, and materially and substantially contributed to the longevity of his disappearance and the severity of his injuries.

## II. STANDARD OF REVIEW

"Federal Rule of Civil Procedure 12(b)(6) provides for 'the dismissal of a complaint if it fails to state a claim upon which relief can be granted.'" *Garnitschnig v. Horovitz*, 48 F. Supp. 3d

820, 828 (D. Md. 2014). "This rule's purpose is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* (internal quotation marks omitted). In considering a motion to dismiss, a court must "accept the factual allegations of the complaint as true and must view the complaint in the light most favorable to the plaintiff." *Ben-Joseph v. Mt. Airy Auto Transporters, LLC,* 529 F. Supp. 2d 604, 606 (D. Md. 2008) (quoting *GE Inv. Private Placement Partners II v. Parker,* 247 F.3d 543, 548 (4th Cir. 2001)). The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

Federal Rule of Civil Procedure 8(a)(2) is also implicitly raised in a motion to dismiss. *Roberson v. Ginnie Mae REMIC Trust 2010 H01*, 973 F. Supp. 2d 585, 586 (D. Md. 2013). The Rule provides that a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has observed that "[w]hen a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. Thus, when ruling on a Rule 12(b)(6) motion to dismiss, the court considers whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell A. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Stated similarly, a complaint must state sufficient facts to demonstrate a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

## III. ARGUMENT

The Amended Complaint alleges a straightforward but serious failure: WMATA employees encountered a visibly disabled and confused passenger during operating hours and failed to follow mandatory operational procedures, provide required assistance, or ensure his safe exit from the station—failures that led to foreseeable and preventable harm. These failures give

rise to Plaintiffs' claims against WMATA, each of which is adequately pled. WMATA fails to reach the high bar to dismiss Plaintiffs' claims under Rule 12(b)(6).

Instead, WMATA repeatedly attempts to recharacterize the pleaded allegations and invites the Court to draw inferences in its favor. At the pleadings stage, however, the Court must accept Plaintiffs' well-pleaded facts as true and draw all reasonable inferences in Plaintiffs' favor. Viewed under that standard, the Amended Complaint plausibly alleges conduct and legal theories, and Defendants' motion therefore fails.

First, as explained below, Plaintiffs' negligence claim is not barred by the doctrine of sovereign immunity. WMATA's failure to abide by mandatory operational policies governing inspection, monitoring, and passenger-assistance procedures falls outside the scope of sovereign immunity. Violations of non-discretionary directives constitute operational conduct, not protected policy judgment. The Court should reject WMATA's first argument.

Second, the Amended Complaint plausibly establishes a claim for negligence and shows that WMATA owed a duty to Rashawn Williams under three independent bases of tort liability. WMATA's argument improperly rests on their assertion that Rashawn was a trespasser; but as a patron of the metro station who had not yet safely exited, Rashawn remained within the scope of WMATA's invitation, and at minimum, his entrant status presents a factual question that cannot be resolved at the pleading stage. WMATA also owed Rashawn a heightened duty of care applicable to common carriers. By failing to ensure his safe egress, WMATA plausibly breached that duty while he remained within the carrier–passenger relationship. Further, WMATA assumed a duty of care through its employees' direct interactions with Rashawn and their undertaking to assist him. Once aware of his presence and visible vulnerability, WMATA was required to exercise reasonable care in carrying out that undertaking.

Finally, the Amended Complaint plausibly asserts discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act by alleging the denial of meaningful access to public transit services. Specifically, Plaintiffs allege a failure to provide reasonable accommodations, effective communication, and necessary assistance, along with facts supporting deliberate indifference sufficient to sustain a claim for compensatory damages.

Because Plaintiffs plausibly seek legal relief under multiple independent and legally cognizable theories, dismissal is unwarranted. The Court should deny Defendant's Motion to Dismiss.

**A. Sovereign immunity does not bar Plaintiffs' negligence claim.**

Under the doctrine of sovereign immunity, "courts do not have jurisdiction to hear cases involving claims for money damages against the State, absent the State's consent to such suit." *Tinsley v. Wash. Metro. Area Transit Auth.*, 429 Md. 217, 223 (2012). The entity asserting immunity bears the burden of demonstrating its entitlement to that protection. *Williams v. Big Picture Loans, LLC*, 929 F.3d 170, 176 (4th Cir. 2019).

WMATA enjoys limited sovereign immunity as an interstate agency and instrumentality of Maryland, Virginia, and the District of Columbia. *Tinsley,* 429 Md. at 223. WMATA's immunity derives from the WMATA Compact ("the Compact"), an interstate agreement ratified by Congress in 1966, through which the signatory jurisdictions conferred their respective immunities upon WMATA. *Id*. However, WMATA's immunity is not absolute. Section 80 of the Compact provides a limited waiver of immunity, stating in relevant part:

> The Authority *shall be liable for its contracts and for its torts and those of its directors, officers, employees and agents committed in the conduct of any proprietary function*, in accordance with the law of the applicable signatory (including rules on conflict of laws), but shall not be liable for any torts occurring in the performance of a governmental function. The exclusive remedy for such breach of contracts and torts for which the Authority shall be liable, as herein provided, shall be by suit against the Authority. Nothing contained in this title shall be construed as a waiver by the District of

> Columbia, Maryland, Virginia and the counties and cities within the zone of any immunity from suit.

Md. Code Ann., Transp. § 10-204(80) (emphasis added). Thus, under Section 80 of the Compact, WMATA retains immunity for torts committed in the performance of governmental functions but waives immunity for torts arising from proprietary functions. *Tinsley*, 429 Md. at 224 (citing *Proctor v. Wash. Metro. Area Transit Auth.*, 412 Md. 691, 710 (2010)).

Courts undertake a two-step analysis to determine whether the WMATA is entitled to sovereign immunity for an alleged tort. First, the Court must consider whether the alleged tort arose through the exercise of a "quintessentially governmental" function. *Feakes v. Wash. Metro. Area Transit Auth.*, No. 8:23-2145-AAQ, 2025 U.S. Dist. LEXIS 180794, at *10 (D. Md. Sept. 16, 2025). If it is not, the Court must then determine "whether the alleged tort was committed through the exercise of a proprietary (or ministerial) function or a discretionary function." *Id*. at *10-11 (quoting *Hendricks v. Wash. Metro. Area Transit Auth.*, No. 8:18-cv-02397, 2024 U.S. Dist. LEXIS 14864, at *4 (D. Md. Jan. 29, 2024)).

1. <u>The alleged conduct is not quintessentially governmental</u>**.**

WMATA's attempt to characterize the alleged conduct as "quintessentially governmental" misstates the Amended Complaint and the governing law. WMATA casts the conduct as within the exclusive purview of law enforcement, and thus quintessentially governmental, because it involves the "protection of customers' security[.]" ECF No. 17, Def's Mot. at 5. But the mere fact that conduct implicates customer safety does not transform routine operational duties into policing. *Wash. Metro. Area Transit Auth. v. O'Neill*, 633 A.2d 834, 839 (D.C. 1993) (distinguishing police powers from broader public protection duties). Protection of passengers is not exclusively a law enforcement function. *Harris v. Wash. Metro. Area Transit Auth.*, 490 F. Supp 3d 295, 314 (D.D.C. 2020) (citing *O'Neill*, 633 A.2d at 839). Operating and

maintaining a transit station, conducting inspections, and assisting passengers are core operational functions of a public transit system aimed at maintaining the safety of customers but are not exercises of police power. *See e.g., Whiteru v. Wash. Metro. Area Transit Auth.*, 258 F. Supp. 3d 175, 185-89 (D.D.C. 2017) (concluding that WMATA was not shielded by sovereign immunity for station manager's failure to follow internal policy regarding closing inspections).

The cases cited by WMATA involve materially different circumstances, namely, discretionary policing decisions. In *Burns v. Wash. Metro. Area Transit Auth.*, 488 F. Supp. 3d 210 (D. Md. 2020), the court addressed WMATA's alleged failure to undertake specific police actions in response to prior notice of criminal activity. Likewise, in *Williams v. Wash. Metro. Area Transit Auth.*, No. GLS-21-2373, 2023 WL 4421573 (D. Md. July 10, 2023), the plaintiff challenged a bus driver's alleged failure to protect her from an assault by another passenger—again implicating discretionary decisions concerning criminal activity. Moreover, in *Simpson v. Wash. Metro. Area Transit Auth.*, 688 F. Supp. 765 (D.D.C. 1988), the court addressed WMATA's crowd-control authority and its exercise of police powers under Section 76 of the Compact. Each of those cases centered on discretionary law-enforcement judgments.

Plaintiffs' allegations are fundamentally different. The Amended Complaint does not challenge criminal investigations, police deployment decisions, or crowd-control measures. Instead, Plaintiffs allege that station personnel failed to comply with operational rules governing inspections, securing restricted areas, and assisting a visibly vulnerable customer—duties carried out at the station level as part of ordinary transit operations.

Because the conduct alleged here concerns routine station management and operations, not the exercise of police authority, it is not quintessentially governmental and not shielded by sovereign immunity.

2. WMATA's conduct was proprietary, not discretionary.

WMATA's negligent conduct was proprietary and not discretionary; therefore, sovereign immunity does not bar Plaintiffs' negligence claim. Where a "statute, regulation, or policy specifically prescribes a course of conduct for an employee to follow" and leaves no room for discretion, the act is proprietary and not shielded by sovereign immunity. *Hendricks*, 2024 U.S. Dist. LEXIS at *3 (quoting *Doe v. Wash. Metro. Area Transit Auth.*, 453 F. Supp. 3d 354, 363 (D.D.C. 2020)); see also *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Whether "phrased as prohibitions" on specific conduct or "as affirmative duties," directives that eliminate discretion impose binding limitations on the range of permissible conduct. *Banneker Ventures, LLC v. Graham,* 798 F.3d 1119, 1143 (D.C. Cir. 2015). Accordingly, the negligent failure to comply with mandatory directives is not protected by sovereign immunity. *Smith v. Wash. Metro. Area Transit Auth.*, 290 F.3d 201, 213 (4th Cir. 2002) (Michael, M., concurring). Claims that "turn[] upon a failure to act in accordance with" prescribed policy therefore fall outside WMATA's sovereign-immunity bar. *Workagegnehu v. Wash. Metro Area Transit Auth.*, 373 F. Supp. 3d 110, 117-18 (D.D.C. 2019).

Here, Plaintiffs allege that WMATA employees failed to comply with mandatory operational rules governing customer assistance, attentiveness, communications, and required station inspections. Specifically, the Amended Complaint asserts that Station Manager, Mr. Yelverton, ignored and failed to assist a visibly distressed, mentally disabled, non-verbal customer, Rashawn Williams, in violation of WMATA General Rules requiring employees to remain attentive, avoid unnecessary distractions, and prioritize customer safety. Am. Compl. ¶¶ 43-47. Plaintiffs further allege WMATA's repeated failure to conduct required visual inspections of station areas, secure station rooms, and ensure no patrons enter or remain in restricted areas,

despite explicit Standard Operating Procedures mandating such inspections with special attention to confused or diminished-capacity customers. *Id*. at ¶¶ 55-56

These allegations concern routine, operational tasks governed by written policies that prescribe specific conduct. They do not implicate discretionary policy judgments. Operating and maintaining a transit station—ensure passengers' safe egress from stations, conducting inspections, securing restricted areas, and assisting passengers—falls squarely within WMATA's proprietary function of operating a public transit system. In *Whiteru*, the court considered whether WMATA was entitled to sovereign immunity where employees failed to follow prescribed rules for conducting station inspections, resulting in a man remaining trapped between a platform and station wall for four and a half days. 258 F. Supp. 3d 175 (D.D.C. 2017). The court held that WMATA was not shielded by immunity because its policies left managers no "unbridled discretion," instead prescribing a specific course of conduct for inspections, including requiring employees to make visual inspections and pay attention to areas where customers with diminished capacity could remain trapped. *Id*. at 187. The same policies are at issue here. Because Plaintiffs allege failures to carry out mandatory operational directives, sovereign immunity does not apply.

WMATA argues that "the essence of Count II is that WMATA should have done a better, non-negligent job in searching for a missing person," but this contention mischaracterizes the claim. Def's Mot. at 8. Although Plaintiffs reference WMATA's inadequate response to the report of Rashawn's disappearance, those allegations are expressly framed in context of WMATA's failure to "follow their own rules and procedures in monitoring and securing the station" and "to properly respond to a confused customer with diminished capacity in need." Am. Compl. ¶ 59. The claim is not premised on discretionary search-and-rescue judgments, but on

WMATA employees' failure to comply with concrete, mandatory operational directives. Even where safety concerns may be implicated, immunity does not attach when the tort arises from WMATA employees' failure to follow such directives. *See e.g., Feakes*, 2025 U.S. Dist. LEXIS at * 14 (holding that WMATA's cleaning schedules constituted ministerial obligations because they imposed specific, mandatory requirements). The prolonged entrapment of Plaintiff Rashawn Williams in a WMATA storage room was not the product of discretionary governmental judgment. It was the foreseeable consequence of repeated failures to carry out required inspections, secure restricted areas, and assist a vulnerable customer in accordance with WMATA's own written rules.

WMATA bears the burden of establishing its entitlement to sovereign immunity. *Williams,* 929 F.3d at 176. Taking the allegations as pled, as required at this stage, WMATA has not demonstrated, as a matter of law, that the challenged conduct was committed in the exercise of a quintessentially governmental function or that it involved protected discretionary judgment. Instead, Plaintiffs allege ministerial failures arising from WMATA's proprietary function of operating and maintaining a public transit system. Sovereign immunity therefore does not bar Count II, and the Court should deny WMATA's motion on these grounds.

**B. Plaintiffs adequately allege a claim for negligence.**

WMATA attempts to abdicate responsibility for its negligence by couching Rashawn Williams as a mere trespasser to whom they owed no tort duty. The Court should reject this argument for three reasons. First, Rashawn was not a trespasser; he was an invitee, and at minimum, entrant status cannot be resolved as a matter of law at this stage of the proceedings. Second, WMATA owed Rashawn a heightened duty of care as a common carrier. Third, regardless of Rashawn's entrant status, WMATA assumed a duty to him through their acts and omissions.

1. Rashawn Williams was not a trespasser, and at minimum, entrant status is a question of fact not properly resolved at the pleading stage.

WMATA rigidly asserts that once Rashawn accessed a non-public room, he became a trespasser to whom only a minimal duty was owed. That argument fails.

Whether a mentally diminished, non-verbal individual who wandered into a back area of a metro station qualifies as a trespasser is itself a fact-intensive question inappropriate for resolution on a motion to dismiss. *See e.g., Mech v. Hearst Corp.,* 64 Md. 422, 426-27 (1985) (recognizing that entrant status depends upon the evidence presented to the factfinder); *Wash. Metro. Area Transit Auth. v. Ward*, 433 A.2d 1072, 1073 (D.C. 1981) (determining that there was sufficient evidence to present to the jury the question of whether the plaintiff was a trespasser, an invitee, or a licensee.); *see also Gable v. Gable*, 245 W. Va. 213, 227 (2021) ("The question of a person's status on property […] is generally a question of fact governed by the circumstances of the case."). At this stage, the Court must draw all reasonable inferences in Plaintiff's favor. Under that standard, dismissal based on trespasser status is improper.

Rashawn was plainly not a trespasser while in the station. He entered the Metro station during normal operating hours of the public and was precisely within the class of persons WMATA invites onto the premises each day. After riding the train and being informed it was no longer in service, Rashawn, as a patron and invitee, was searching for an exit to the station and attempting to gain assistance from a WMATA employee at the kiosk. At that time, he was unquestionably an invitee, and WMATA owed him the corresponding duty of reasonable care. *Howard County Bd. of Educ. v. Cheyne*, 99 Md. App. 150, 155 (1994) ("An invitee is, in general, a person invited or permitted to enter or remain on one's property for purposes connected with or related to the possessor's business.").

WMATA's motion as to Count II seems to concern only their duty to Rashawn after he entered the AOR, at which point they assert that he became a trespasser. But a patron does not suddenly become a trespasser simply because he inadvertently wanders into an area that is unsecured and/or insufficiently restricted—particularly where, as here, the individual is disabled, non-verbal, in obvious need of assistance, and searching for an exit. In *Boyrie v. E & G Prop. Servs.*, 58 A.3d 475 (D.C. 2013), the court emphasized that an individual is not automatically deemed a trespasser merely because they enter an area without express invitation. Rather, the court explained that entrant status turns on whether the person could reasonably believe the area was within the scope of the owner's invitation, particularly where the property owner has not clearly restricted access or manifested an intent to exclude the public. *Id*. at 478 (holding that record did not establish as a matter of law that the plaintiff was a trespasser because a reasonable person could have concluded that the area was open to the public.); *see also Miller & Long Co. v. Shaw*, 204 A.2d 697, 700 (D.C. 1964) (an invitation to enter "may be implied from environment and the apparent nature of the facilities in it") (citing *Glaze v. Benson*, 205 Md. 26, 31 (1954)).

Here, when Rashawn entered the AOR, he did not knowingly or intentionally exceed the scope of his invitation, and such knowledge or intent cannot be inferred from the Amended Complaint. Nor was his presence in the room so clearly outside the public domain that trespasser status can be declared as a matter of law. Rather, on the contrary, the Amended Complaint alleges that the AOR was accessed through an unlocked emergency exit door within the station and that Rashawn was ultimately found in a room containing a stairway and emergency exit ladder with access to the street. Am. Compl. ¶¶ 51–52. The Amended Complaint does not designate the AOR as non-public, and at best WMATA's conclusory assertion that emergency-

use areas are not open to the public for general use raises a factual question inappropriate for resolution at this stage. Def's Mot. at 11. Drawing all reasonable inferences in Plaintiff's favor, it is entirely plausible that a patron searching for an exit—particularly one who had received no assistance from WMATA employees—could inadvertently enter such an area believing it to be part of the station's egress route.

Whether the AOR fell outside the scope of WMATA's public invitation, whether access was sufficiently restricted to revoke invitee status, and whether Rashawn could knowingly exceed that scope under the circumstances are quintessential factual questions. These issues cannot be resolved as a matter of law at the pleading stage. Accordingly, the Court should deny WMATA's attempt to avoid tort liability by characterizing Rashawn as a trespasser.

2. WMATA owed a heightened duty of care to Rashawn Williams because it is a common carrier.

Under Maryland law, common carriers like WMATA "owe passengers the highest degree of care to provide safe means and methods of transportation." *Feakes*, 2025 U.S. Dist. LEXIS at *36 (internal citations omitted). "[A] common carrier is required to use the utmost degree of care and skill in everything that concerns the safety of passengers." *Id*. (quoting *Kaplan v. Baltimore & O.R. Co.*, 207 Md. 56, 59 (Md. 1955)). This "duty is not limited to the actual transportation of passengers." *Id.* It encompasses the exercise of reasonable vigilance for passenger safety and protecting patrons from reasonably foreseeable harm while on the carrier's premises. *See id*.

WMATA owed Rashawn this heightened duty of care while he was inside the Glenmont Metro Station. WMATA had a duty to protect Rashawn from foreseeable harm and affirmatively render aid if they knew or had reason to know that he was in need of assistance. *See* RESTATEMENT (SECOND) OF TORTS § 314. In other words, once Rashawn was on WMATA's premises, WMATA had a duty to take reasonable steps to assist him in safely exiting the station

if it knew or should have known that he required help. The obligation to aid is a natural and well-established component of the special relationship between a common carrier and its passengers, and it extends to circumstances involving passenger ingress and egress. Further, once a common carrier has actual or constructive knowledge of a person's presence and potential peril, a duty of ordinary care arises, regardless of trespasser status. *Whiteru v. Wash. Metro. Area. Transit Autho.,* 346 A.3d 1188, 1197 (D.C. 2025) ("If the trespasser has been discovered or is known to be present, the landowner must exercise ordinary care to avoid injuring him."); *see also* RESTATEMENT (SECOND) OF TORTS § 336. Constructive knowledge exists where there are facts within the land possessor's knowledge that would lead a reasonable person to conclude a trespasser is present. *Id*. § 336 cmt. d. If a common carrier has reason to know that a trespasser is in a non-public part of the property, it is bound to inspect or keep a lookout for that trespasser. *Whiteru*, 346 A.3d at 1203.

Here, the Amended Complaint plausibly alleges that WMATA employees observed Rashawn in the station, recognized his visible confusion and diminished capacity, failed to monitor restricted areas, ignored his requests for assistance, and did not ensure his safe exit. These allegations demonstrate WMATA's actual or constructive knowledge of Rashawn's peril, and the Court can infer that harm was foreseeable, that the employees breached their duty, and that this breach proximately caused Rashawn's injuries. Additionally, if the Court finds that Rashawn *was* a trespasser when he entered the AOR, "the exact duty owed to such a trespasser is fact-dependent." *Whiteru*, 346 A.3d at 1197. At the pleading stage, these factual allegations are sufficient to defeat a motion to dismiss.

3. <u>WMATA assumed a duty to Rashawn Williams through its acts and omissions</u>.

Even apart from common-carrier principles, one who undertakes to assist another assumes a duty to do so with reasonable care. RESTATEMENT (SECOND) OF TORTS § 323. That duty includes exercising reasonable care "to complete [the undertaking] or to protect the other when he discontinues it." *Id*. § 323 cmt (a). The actor that starts to aid does not necessarily need to continue his services, "unless, by giving the aid, he has put the other in a worse position than he was in before the actor attempted to aid him." *Id*. § 323 cmt. (c). Here, the Amended Complaint alleges that Rashawn was present in a WMATA station during operating hours as a patron of the system. Am. Compl. ¶ 38. WMATA employees directly encountered him, observed that he was visibly confused, mentally diminished, and unable to navigate out of the station, and attempted to direct him toward the exit. *Id*. at ¶¶ 39-40. Despite these observations, employees then ignored him, engaged in unnecessary distractions—including a personal phone call—and failed to take reasonable steps to ensure his safe exit. *Id*. at ¶¶ 42-46. Those allegations demonstrate that WMATA owed Rashawn a duty of care arising both from its status as a common carrier and from the employee's direct engagement with him. Employees had an affirmative duty to assist a visibly impaired patron, including providing guidance, monitoring for safety, and ensuring he could exit the station. By failing to fulfill this duty, WMATA breached its duty of care. Whether Rashawn later entered the AOR does not extinguish WMATA's assumed duty arising from those direct encounters or WMATA's heightened responsibilities as a common carrier.

An illustration to the Restatement § 323 states:

> A, an employee of B Company, complains to the manager of the Company that she is ill, and asks that she be sent home. She is sent home in one of the Company's delivery wagons. The street leading to A's house is rough and unpaved, and although it is raining, the driver refuses to go further, and tells A to get out and walk the rest of the distance, as a result of which her illness is increased. B Company is subject to

> liability for the increase in A's illness caused by her exertion and her exposure to the rainy weather.

*Id.* The illustration is similar to the events in this matter. WMATA began the task of directing Rashawn out of a Metro train and into the station but failed to ensure he was actually able to leave and do so safely. Thus, in engaging with him, facilitating his departure from the train, and then abandoning him without further help to correctly and safely egress—when he clearly and conspicuously required it--WMATA put him in a more perilous situation, leading him to become trapped in the station. WMATA remains liable for their breach of care.

Moreover, "in determining the existence of a duty owed to a plaintiff, [courts] have applied a 'foreseeability of harm' test[.]" *Valentine v. On Target, Inc.*, 353 Md. 544, 551 (1999). "Foreseeability as a factor in the determination of the existence of a duty involves a prospective consideration of the facts existing at the time of the negligent conduct." *Henley v. Prince George's County*, 305 Md. 320, 336 (1986). Here, the Amended Complaint alleges that WMATA's own Standard Operating Procedures require employees to conduct visual inspections to ensure no customers remain in the station, pay particular attention to confused or diminished-capacity individuals, inspect and secure restricted rooms, and perform daily AOR/ASOD inspections to confirm such areas are empty. Am. Compl. ¶ 56. These policies demonstrate that WMATA expressly anticipates the presence of confused or mentally diminished patrons and the risk that such individuals may remain in the station or enter non-public areas. The precise harm that occurred— an impaired patron remaining inside the station and becoming trapped in a locked room— was neither extraordinary nor unforeseeable. It was a risk specifically contemplated by WMATA.

"Negligence is a relative concept and must be decided on the facts of each particular case; ordinarily, it is a question of fact to be determined by the jury." *Sullivan v. Wash. Metro.*

*Area Transit Auth.*, No. GLS-19-300, 2020 U.S. Dist. LEXIS 32859, at *2 (D. Md. Feb. 26, 2020). Taking the allegations as true and drawing reasonable inferences in Plaintiffs' favor, the Amended Complaint plausibly alleges that WMATA owed Rashawn a duty arising from its status as a common carrier, from its direct engagement and assumed undertaking, and from the foreseeable risks its own policies were designed to prevent. The Amended Complaint further alleges that WMATA breached that duty through multiple operational failures, resulting in harm to Rashawn. Once a legal duty is plausibly established, whether WMATA's conduct met the applicable standard of care presents questions of fact for the jury, not the Court. The Court should deny WMATA's motion to dismiss Plaintiffs' negligence claim.

### C. Plaintiffs adequately allege a claim for violation of Title II of the ADA and for violation of the Rehabilitation Act.

Under Title II of the Americans with Disabilities Act of 1990 (ADA), "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, under Section 504 of the Rehabilitation Act, "no otherwise qualified individual with a disability in the United States, [], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any such program or activity." 29 U.S.C. § 794(a). The standards governing Title II and Section 504 claims are "generally the same." *Seremeth v. Bd. of Cty. Comm'rs of Frederick*, 673 F.3d 333, 336 n.1 (4th Cir. 2012) Further, to "the extent possible, [courts] construe similar provisions in the two statutes consistently." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 214 (4th Cir. 2002).

To state a claim for violation of Title II of the ADA, a plaintiff must plausibly allege: (1) he has a disability; (2) he was excluded from participation in, or denied the benefits of, a public

entity's services, programs, or activities for which he was otherwise qualified; and (3) the exclusion, denial of benefits, or discrimination was by reason of the disability. *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-503 (4th Cir. 2016). Likewise, to state a claim under Section 504, a plaintiff must allege that (1) he has a qualifying disability; (2) he was denied the benefits of a program or activity receiving federal financial assistance; and (3) the denial or discrimination occurred solely by reason of his disability. *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 832 (4th Cir. 1994).

As a threshold matter, the Amended Complaint alleges that Plaintiff Rashawn Williams has a mental impairment that substantially limits major life activities within the meaning of 42 U.S.C. § 12102(1). Further, WMATA is a public entity subject to Title II and a recipient of federal funds subject to the Rehabilitation Act. 42 U.S.C. § 12131(1); 42 U.S.C. § 12161; 29 U.S.C. § 194(b)(1); *see also* Am. Compl. ¶¶ 101-03, 118. Defendant does not meaningfully dispute these threshold elements.

1. <u>Plaintiff Rashawn Williams was denied meaningful access to WMATA’s transit services.</u>

It is a violation of both Title II of the ADA and Section 504 of the Rehabilitation Act if the plaintiff is excluded from participation in or denied the benefits of the services, programs, or activities of a public entity. *See* 42 U.S.C. §12132; 29 U.S.C. § 794(a).

Equal opportunity to participate in and enjoy public services encompasses the duty to make reasonable modifications and providing auxiliary aids and services necessary to ensure effective communications with members of the public. 28 C.F.R. § 35.130(b)(7); 28 C.F.R. § 35.160. WMATA, as a public transportation provider, must also “ensure that personnel are trained to proficiency, as appropriate to their duties, so that they . . . properly assist and treat individuals with disabilities who use the service in a respectful and courteous way,” “make

available to individuals with disabilities adequate information concerning transportation services," and "maintain in operative condition those features of facilities and vehicles that are required to make the vehicles and facilities readily accessible to and usable by individuals with disabilities." 49 C.F.R. §§ 37.173; 37.167(f); 37.161(a).

WMATA challenges Plaintiffs' assertion that Rashawn was excluded or denied access to WMATA services by attempting to define the relevant services narrowly as merely the act of riding a train. Def's Mot. at 16. However, public transportation systems include not only the mechanical operation of trains, but the full range of services necessary to make transit accessible and usable. Access to transit systems necessarily includes safe egress, adequate and effective communication, and assistance to customers when needed. *See e.g., Seremeth v. Bd. of Cty. Comm'rs of Frederick*, 673 F.3d 333, 337 (4th Cir. 2012) (finding the injury as "the failure to make communication as effective as it would have been among deputies and persons without disabilities."). A public entity cannot satisfy Title II or Section 504 simply because a disabled individual boarded a vehicle if the entity later fails to provide the communication, guidance, or assistance necessary to exit safely.

The Amended Complaint alleges that Rashawn was denied meaningful access to WMATA services when service ended: WMATA failed to provide effective communication, failed to ensure he could safely exit the station, and failed to assist him despite his visible confusion and diminished capacity. Am. Compl. ¶¶ 39–46. Unlike non-disabled riders who could interpret signage, Rashawn allegedly could not safely navigate the station without accommodation and assistance. It is clear from the Amended Complaint that had WMATA employees communicated and assisted with Rashawn as he stood confused and frustrated at the

station's exit, he would not have wandered back into the station where he ultimately was trapped for six days.

Thus, the Amended Complaint plausibly alleges that WMATA's failures deprived Rashawn of the meaningful opportunity to access and benefit from public transit services, satisfying the *prima facie* elements of both Title II and Section 504.

2. The Amended Complaint plausibly alleges discrimination "by reason of" disability.

The Amended Complaint also plausibly alleges discrimination "by reason of" disability under both Title II of the ADA and Section 504 of the Rehabilitation Act. The Fourth Circuit recognizes three potential theories of liability: (1) intentional discrimination (disparate treatment), (2) disparate impact, or (3) failure to make reasonable accommodations. *A Helping Hand, LLC v. Balt. Cnty.,* 515 F.3d 356, 362 (4th Cir. 2008). Plaintiffs plausibly allege liability under at least the first and third theories.

*a. The Amended Complaint plausibly alleges intentional discrimination under Title II and Section 504.*

Plaintiffs plausibly allege the first theory of liability, intentional discrimination, by demonstrating WMATA's deliberate indifference to Rashawn's federally protected rights, thereby satisfying the standard for liability and compensatory damages under both Title II of the ADA and Section 504 of the Rehabilitation Act.

"The level of proof necessary for finding intentional discrimination [] means a deliberate indifference to a strong likelihood that a violation of federal rights would result." *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 382 (D. Md. 2011) (quoting *Proctor v. Prince George's Hospital Ctr.,* 32 F. Supp. 2d 820, 829 (D. Md. 1998)). Compensatory damages under Title II and Section 504 are available upon proof of intentional discrimination, which may be established by deliberate indifference. *Pandazides*, 13 F.3d at 829–30; *Paulone,* 787 F. Supp. 2d at 382 (D.

Md. 2011). A plaintiff need not show "discriminatory animus" to prevail on a claim for damages under Title II of the ADA or § 504 of the Rehabilitation Act. *Pandazides*, 13 F.3d at 830 n. 9.

Compensatory damages are available "if defendants acted knowingly, voluntarily, and deliberately, even if the violations resulted from mere thoughtlessness and indifference rather than because of any intent to deny Plaintiff's rights." *Adams v. Montgomery College (Rockville)*, 834 F. Supp. 2d 386, 394 (D. Md. 2011) (citing *Proctor*, 32 F. Supp.2d at 828) (internal quotations omitted); *see also Paulone*, 787 F. Supp. 2d at 388 (holding plaintiff's allegations that detention center personnel refused to accommodate her stated a claim of deliberate indifference under the ADA because defendant police officers were aware of deaf plaintiff's disability, and because the sheriff's office policy calling for reasonable accommodation for deaf detainees put them on notice of potential liability). At the pleading stage, a plaintiff need only allege facts permitting a reasonable inference of such knowledge and inaction.

Here, the Amended Complaint satisfies that standard. Plaintiffs allege that WMATA personnel directly observed Rashawn's visible and obvious disability; recognized that he was confused and unable to navigate the station independently; interacted with him; and nevertheless failed to provide effective communication, guidance, monitoring, or assistance necessary to ensure his safe exit after service ended. Plaintiffs further allege that WMATA's own regulations and operating procedures contemplate the risk that confused or diminished-capacity individuals may remain in stations or enter restricted areas.

These allegations support a plausible inference that WMATA personnel knew a disabled rider faced a substantial risk of being denied safe and equal access to transit services and failed to act. That is sufficient to allege deliberate indifference at the Rule 12(b)(6) stage. Whether the

evidence ultimately establishes deliberate indifference presents a factual question inappropriate for resolution on a motion to dismiss.

*b. The Amended Complaints also plausibly alleges discrimination based on WMATA's failure to make reasonable accommodations.*

Even if this Court were to conclude that deliberate indifference has not yet been adequately alleged, Plaintiffs plausibly state a claim under the third recognized theory of liability: WMATA's failure to make reasonable accommodations for Rashawn's known disability, as required by Title II and Section 504.

Discrimination under Title II and Section 504 expressly includes the failure to make reasonable accommodations to the known physical or mental limitations of a qualified individual with a disability. *Seremeth*, 673 F.3d at 336 ("Discrimination includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."); *see also* 28 C.F.R. § 35.130(b)(7). A plaintiff need not prove animus but the denial of reasonable accommodations necessary for meaningful access constitutes discrimination. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). To state a failure-to-accommodate claim, a plaintiff must plausibly allege that (1) he had a disability; (2) the public entity knew or should reasonably have known of the disability; (3) an accommodation was necessary to afford meaningful access; and (4) the entity failed to provide it. *Lamone*, 813 F.3d at 507.

The Amended Complaint meets each element. It alleges that Rashawn's disability was visible or otherwise apparent; that he exhibited confusion and diminished capacity; that he sought attention and assistance; and that WMATA employees directly interacted with him but failed to respond appropriately. When a disability and resulting need for assistance are obvious, a

public entity's obligation to provide reasonable accommodations is triggered even absent a formal request. *Seremeth*, 673 F.3d at 337.

The accommodations identified are concrete and grounded in federal regulations: effective communication regarding discontinued service, clear direction for exiting the station, information about alternative transportation, personnel assistance to ensure safe egress, and monitoring and inspection of areas where vulnerable riders may become stranded. *See* 28 C.F.R. § 35.160; 49 C.F.R. § 37.167(f). These are precisely the types of auxiliary aids, services, and reasonable modifications required to ensure equal access to public transportation.

Defendant's contention that WMATA lacked notice or that no accommodation is identified mischaracterizes the pleadings and draws inferences in Defendant's favor. The need for assistance was allegedly obvious, and the requested accommodations are specifically described. At this stage, Plaintiffs need only plausibly allege that reasonable accommodations were available and necessary for meaningful access. They have done so, thus dismissal is unwarranted.

**D. Plaintiffs are entitled to a trial by jury.**

Defendant's effort to strike Plaintiffs' jury demand rests on the incorrect premise that compensatory damages are categorically unavailable. The Seventh Amendment to the U.S. Constitution preserves the right to a jury trial in actions seeking legal relief, including compensatory damages. *Tull v. United States*, 481 U.S. 412, 417-18 (1987). Where a plaintiff plausibly seeks monetary damages under viable causes of action, the jury right attaches.

As set forth above, the Amended Complaint plausibly alleges intentional discrimination under Title II of the ADA and Section 504 of the Rehabilitation Act in the form of deliberate indifference. To recover compensatory damages under those statutes, a plaintiff must ultimately

prove intentional discrimination, which may be established by showing that the public entity had knowledge that harm to a federally protected right was substantially likely and failed to act. *Pandazides*, 13 F.3d at 829–30 & n.9; *Paulone,* 787 F. Supp. 2d at 382. The Amended Complaint alleges that WMATA personnel observed Rashawn's visible disability, recognized his confusion and inability to navigate the station safely, directly interacted with him, and nevertheless failed to provide effective communication, assistance, or accommodations required by federal law. Those allegations support a reasonable inference of deliberate indifference. At the pleading stage, that is sufficient to preserve a claim for compensatory damages under both statutes.

WMATA's argument improperly conflates the ultimate availability of damages with the sufficiency of the pleadings. Whether Plaintiffs can ultimately prove deliberate indifference or the full measure of compensatory damages is a question for summary judgment or trial— not a basis to strike the jury demand at the Rule 12 stage. As long as a plaintiff plausibly seeks legal relief under viable causes of action, the jury right remains intact. *See Martin v. Howard County*, 349 Md. 469, 480 (1998) ("[W]hen a party presents legal issues and legal claims for relief in an action which also involves equitable issues and claims, the party is ordinarily entitled to a jury trial on the legal issues and legal claims for relief.") (citing *Edwards v. Gramling Eng'g Corp.*, 322 Md. 535, 542-43 (1991)).

Because the Amended Complaint asserts claims for compensatory damages under the ADA and the Rehabilitation Act, Plaintiffs are entitled to have those claims tried to a jury. Defendant's request to eliminate the jury demand should therefore be denied.

## IV. CONCLUSION

Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By: _/s/____________________________________
Timothy Maloney, Esq. (No. 03381)
tmaloney@jgllaw.com
Drew LaFramboise, Esq. (No. 20288)
dlaframboise@jgllaw.com
Bridget Cardinale, Esq. (No. 30608)
bcardinale@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
(301) 220-2200 (tel.)
(301) 220-1214 (fax)

*Counsel for Plaintiffs*
*Jimmy Hall and Christina Hall*
*as Co-Guardian of the Person and*
*Property of Rashawn Williams*

## CERTIFICIATE OF SERVICE

I hereby certify that on March 4, 2026, a copy of the foregoing was served upon all counsel of record via the Court's electronic case filing system.

/s/ Drew LaFramboise____________
Drew LaFramboise, Esq. (No. 20288)